AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 13-264 BPG |
| | ) | |
| | ) | |
| | ) | |
| BRIAN L. JOHNSON | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____09/01/2012_____ in the county of _____United States_____ in the
_____Northern_____ District of _____Maryland_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 1349 | Conspiracy to commit wire fraud |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Troy Springer, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __2-8-13__

_____
*Judge's signature*

City and state: _____Baltimore, Maryland_____   Beth P. Gesner, U.S. Magistrate Judge
*Printed name and title*



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 FEB 11  A 11: 43

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, TROY SPRINGER ("Affiant"), being duly sworn, depose and state as follows:

I am a Special Agent of the Office of Labor Racketeering and Fraud Investigations for the United States Department of Labor, Office of Inspector General, duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that **BRIAN L. JOHNSON** ("JOHNSON"), DOB XX/XX/1960, and **BEATRICE D. SAMPSON-JOHNSON** ("SAMPSON"), DOB XX/XX/1959, have been engaged in a conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  More specifically, there is probable cause to believe that JOHNSON and SAMPSON have been engaged in a scheme to unlawfully obtain unemployment insurance benefits from the Maryland Department of Labor, Licensing and Regulation ("DLLR") by posing as former employees of a fictitious company. Pursuant to Federal Rule of Criminal Procedure 4(a), this Affidavit is being submitted in support of (1) a Criminal Complaint charging JOHNSON and SAMPSON with that offense and (2) the issuance of warrants for their arrest.

**I.      IDENTITY AND EXPERTISE OF AFFIANT**

1.      Your Affiant is employed as a Special Agent of the Office of Labor Racketeering and Fraud Investigations ("OLRFI") for the United States Department of Labor ("DOL"), Office of Inspector General ("OIG"), and has been so employed since September 2003. Your Affiant is currently assigned to the Washington, D.C. Regional OLRFI. Before becoming a Special Agent with OLRFI, your Affiant was an Intelligence Analyst with OLRFI for approximately two (2) years. Your Affiant is a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and has received advanced in-service training in labor racketeering and program fraud investigations.

2.      During my tenure as an OLRFI Special Agent, your Affiant has participated as the lead investigator or "case agent" on labor racketeering and program fraud

1

investigations involving violations of Title 18, United States Code. During my experience in law enforcement, your Affiant has been the affiant on affidavits in support of applications for search warrants and has participated in numerous executions of arrest warrants and search warrants. As part of my current responsibilities, your Affiant conducts criminal investigations involving alleged violations relating to unemployment insurance fraud, labor racketeering, employment-based visa fraud, Federal workers' compensation fraud, and other related criminal violations. Your Affiant conducts interviews, participates in the execution of search and arrest warrants, and gathers evidence through the use of various investigative techniques. Through training, education, and experience, your Affiant has become familiar with various ways in which individuals and groups fraudulently obtain Government benefits.

3.      Your Affiant has been personally involved in the investigation since its inception in or around January 2012. The information set forth herein is based on your Affiant's own personal knowledge and observations; information from DLLR; official records; recorded and monitored audio telephone calls from correctional facilities; information provided by cooperating defendants; analysis of telephone subscriber and toll records; and, physical surveillance.

4.      This Affidavit is not intended to include each and every fact and matter observed by your Affiant or known to the Government related to the subject matter of this investigation. Instead, this Affidavit contains only those facts necessary to establish probable cause pursuant to Rule 4(a) of the Federal Rules of Criminal Procedure.

## II.      PROBABLE CAUSE

### A.      Background

5.      Based upon a review of criminal history reports and information provided by the Maryland Department of Public Safety and Correctional Services ("DPSCS"), including the Division of Parole and Probation ("DPP"), your Affiant knows that JOHNSON, who currently resides with SAMPSON at 1517 Presstman Street, Baltimore, Maryland (hereinafter "Presstman Street"), has served several periods of incarceration starting in 1977 and as recently as in 2012. Specifically, DPP records reflect that JOHNSON recently served a period of incarceration in Baltimore DPSCS correctional facilities between in or around January 2012 through in or around September 2012.

2

6.     Based on your Affiant's investigation and the facts set forth in this Affidavit, your Affiant believes the scheme to unlawfully obtain unemployment insurance involves the following steps:

    a. Members of the conspiracy create sham companies under the laws of the State of Maryland;

    b. In relation to those companies, members of the conspiracy file false and fraudulent quarterly contribution reports with DLLR that contain individuals' social security numbers, asserting that the company employed and paid wages to those individuals;

    c. Individuals purporting to be the individuals listed as employees in the quarterly contribution reports file unemployment insurance claims with DLLR alleging that their employment with the respective company that filed the quarterly contribution reports has been terminated;

    d. DLLR, through a debit card company, issues unemployment insurance benefits to unemployment insurance applicants on debit cards, which are mailed to the address provided by the person (the purported former employee) filing the unemployment claim;

    e. An individual, purporting to be the person whose identity was used to file the claim, calls DLLR approximately every two (2) weeks to continue the claim by telephonically answering a series of automated questions, known as "Telecert", causing additional benefits to be issued to the debit cards; and

    f. Members of the conspiracy then illegally obtain unemployment insurance benefits by either withdrawing cash from automated teller machines ("ATM") or by using the debit cards online or at retail points of sale.

**B.     Unemployment Insurance Process**

7.     Employers in Maryland are required to submit quarterly contribution reports that list, among other items, the individual employees who worked for the business and the amount of wages they were paid. Businesses are required to submit this report and remit unemployment taxes to DLLR within approximately one month following the end of each quarter.

8.     A former employee of a business who has lost his or her job has the ability to contact DLLR and submit a claim for unemployment insurance benefits. If the former employee meets certain requirements, including, but not limited to, having received a sufficient amount of wages prior to separation and being ready, willing and able to work,

they become eligible to receive unemployment insurance benefits. DLLR relies on the truthfulness of the quarterly contribution report submitted by the former employer to verify wages and on the truthfulness of the answers provided by a claimant during the "Telecert" process to file initial and continuing unemployment insurance claims and, thus the claimant's eligibility for unemployment insurance benefits.

9.      After DLLR processes the unemployment insurance claim, Citi Prepaid Services (hereinafter, "Citi"), pursuant to a contract with DLLR, mails a Citi Prepaid VISA debit card to the address provided for the claimant. DLLR subsequently authorizes the application of unemployment insurance benefits to the debit card (i.e., pays out money from Maryland's Unemployment Insurance Trust Fund), and continues to do so on a periodic basis as long as the claimant continues to file for a continuation of unemployment insurance benefits.

10.      DLLR sends digital files via the Internet to the Citi Prepaid data service center in Conshohocken, Pennsylvania, to create new unemployment insurance claimant accounts and to designate funding for both new and existing claimant accounts, and DLLR wired money to fund the Citi debit cards from its bank account in Maryland to Citi's bank account in New York via the Richmond Federal Reserve.

11.      Part of the funding for the infrastructure of state unemployment insurance comes from the Federal taxes paid by employers known as the Federal Unemployment Tax Account. On or about July 1, 2008, the United States Congress passed an Emergency Unemployment Compensation ("EUC") law that stated that any unemployment insurance benefits that were received after the claimant's state benefits expired would be fully funded by the Federal government. Congress created and funded the Extended Unemployment Compensation Account ("EUCA") to fund the payment of extended benefits. States, including the State of Maryland, draw money from the EUCA to fund all extended unemployment insurance benefits.

C.      **Fictitious Employer Scheme - Cooperating Defendants 1 and 2**

12.      In 2012, two cooperating defendants (hereinafter, "CD-1" and "CD-2") pled guilty in federal court in the District of Maryland to conspiracy to commit access device fraud and aggravated identity theft in a scheme to fraudulently obtain

unemployment insurance benefits from the State of Maryland. Your Affiant was the case agent in that investigation. According to his/her plea agreement and the statement of facts attached thereto, CD-1 admitted that he/she created several fictitious Maryland companies, including an employer entity called "Nathaniel Jefferson," which had no legitimate business interests or employees. CD-1 then filed fraudulent quarterly reports with DLLR under the names of the fictitious Maryland companies, including "Nathaniel Jefferson", which falsely claimed that certain individuals had been employed and received wages at the companies during that quarter. Specifically, on or about August 4, 2010, CD-1 electronically filed fraudulent quarterly contribution reports with DLLR for the quarters ending June 2009, September 2009, December 2009, March 2010, June 2010, and September 2010 for the purported employer named "Nathaniel Jefferson".

13.     Each of the fraudulent quarterly contribution reports submitted to DLLR by CD-1 for the fictitious "Nathaniel Jefferson" entity falsely claimed that "Nathaniel Jefferson" had three (3) employees, including CD-2 and JOHNSON. According to DLLR records, on October 14, 2010, an individual who identified himself as JOHNSON submitted an initial claim for unemployment insurance benefits online with DLLR through his purported employment with "Nathaniel Jefferson". Subsequently, on January 12, 2011, and again on January 17, 2011, an individual who identified himself as JOHNSON filed two (2) subsequent reopened claims for unemployment insurance compensation benefits with DLLR related to his fictitious employment with "Nathaniel Jefferson". The claims submitted on January 12, 2011, and January 17, 2011, reflect a mailing address of Presstman Street for the individual who identified himself as JOHNSON.

14.     DLLR subsequently requested that Citi issue a debit card in the name of JOHNSON (hereinafter, "JOHNSON Citi debit card"). Citi thereafter created and mailed JOHNSON's debit card.

15.     According to DLLR records reviewed by your Affiant for the period of October 2010 to April 2012, an individual who identified himself as JOHNSON routinely contacted DLLR and filed continuing claims for unemployment insurance benefits, primarily through the "Telecert" automated system. As a result, DLLR/Citi funded the card with unemployment insurance compensation benefits (in the form of adding credits on the debit card) from in or around October 2010 through May 2012. In total, DLLR (via

Citi) credited approximately $20,000 in unemployment insurance benefits to the JOHNSON Citi debit card, including approximately $13,500 in federal EUC benefits. DLLR records reflect that unemployment insurance benefits, including federal EUC benefits, for the JOHNSON claim were completely exhausted by in or around April or May 2012. As previously noted, before EUC benefits can be accessed on the Citi debit card, multiple interstate wires are sent by DLLR to Citi Prepaid data service to create the claimant account and continuously designate and update the amount of funding at given points in time. Funds are also wired interstate from the DLLR's Maryland bank account to Citi's New York bank account via the Richmond Federal Reserve.

16.     Pursuant to his/her plea agreement, CD-1 voluntarily proffered information on September 12, 2012. Among other information, CD-1 advised, in substance and in part, that JOHNSON participated with CD-1 and CD-2 from the beginning of the conspiracy to fraudulently obtain unemployment insurance benefits. CD-1 knew JOHNSON from prison as they met each other while both were incarcerated at the Brockbridge correctional facility in Jessup, Maryland. CD-1 further advised that after participating in the unemployment insurance fraud at the beginning of the conspiracy, JOHNSON then went on his own.

17.     Pursuant to his/her plea agreement, CD-2 voluntarily proffered information separately on October 25, 2012. Among other information, CD-2 advised, in substance and in part, that CD-2 knew JOHNSON and that JOHNSON was "best of homeboys" with CD-1.[1] CD-2 further advised that JOHNSON gave CD-1 permission to use JOHNSON's name to fraudulently obtain unemployment insurance benefits and that CD-1 initially obtained and held onto the JOHNSON Citi debit card after receiving it. However, according to CD-2, in the winter of 2010, CD-1 and CD-2 drove together to meet JOHNSON on Calhoun Street[2] in Baltimore because JOHNSON had learned that CD-1 was not giving JOHNSON his cut of the unemployment insurance benefits obtained in JOHNSON's name. CD-1 told CD-2 that CD-1 needed to give money back to JOHNSON to "hush" JOHNSON's complaints. While CD-2 stayed in the car, CD-1 and JOHNSON spoke

---

[1]     Your Affiant showed CD-2 a color photograph of JOHNSON with JOHNSON's identifying information redacted. CD-2 could not specifically identify JOHNSON by name; rather, CD-2 could only say that JOHNSON looked familiar.

[2]     According to an online Google map search conducted by your Affiant on January 3, 2013, Presstman Street is located approximately two (2) blocks from an intersection with Calhoun Street.

to one another outside of the car. It is the belief of CD-2 that CD-1 gave the JOHNSON Citi debit card to JOHNSON sometime during the meeting on Calhoun Street.

18. Records provided by Citi and reviewed by your Affiant indicate that someone contacted Citi customer service on or about January 27, 2011 and changed the address of record for the JOHNSON Citi debit card account to Presstman Street. Furthermore, records provided by DLLR and reviewed by your Affiant reflect a notation recorded on or about October 14, 2011 indicating a change of address to Presstman Street as the address of record on the unemployment insurance claim filed on behalf of JOHNSON.

### D. SAMPSON Fraudulently Filed Continuing Claims for Unemployment Insurance on Behalf of JOHNSON While JOHNSON Was Incarcerated

19. As previously noted, to file a continuing claim for unemployment insurance compensation, an individual can contact DLLR by telephone approximately every two (2) weeks and answer a series of automated questions, known as "Telecert", causing additional benefits to be issued to the debit cards if the claimant is eligible. The "Telecert" automated system advises the caller if there is one or two weeks available for a claimant to file, provides the caller with beginning and ending dates for the week(s) for which the claimant is filing, and asks a series of questions. The caller is prompted to answer the automated questions by pressing "1" on the telephone keypad for "Yes" and "2" for "No". The first question posed to the claimant by the "Telecert" automated system is: "Were you able and available to work full-time in your occupation without restrictions?"

20. Also, as previously mentioned, the investigation conducted by your Affiant revealed that JOHNSON served a period of incarceration from at least in or around January 2012 through in or around September 2012[3] at DPSCS correctional facilities located in Baltimore, Maryland. In addition to the fact that the entire JOHNSON's unemployment insurance claim was based upon a fictitious employer scheme, he was also ineligible to file continuing claims for unemployment insurance compensation while he was imprisoned because he was unable and unavailable to work full-time. However, as more fully set forth below, JOHNSON knowingly and willfully, with the assistance of SAMPSON, continued to fraudulently file continuing claims for unemployment insurance compensation benefits

---

[3]    DPSCS and DPP records reflect that JOHNSON was released from custody for a brief period of time between in or around late January 2012 until in or around late February 2012.

while he was imprisoned, and he certified that he was able and available to work full-time without restrictions.

21.     DPSCS correctional facilities employ a call monitoring system that electronically monitors and records outgoing calls placed by inmates. To date, your Affiant has reviewed some of the electronically recorded and monitored telephone calls placed by JOHNSON between on or about January 1, 2012, until on or about September 15, 2012, from DPSCS correctional institutions. The call monitoring system advises the inmate at the onset of each call that "this call is subject to recording and monitoring." The hard copy call records reflect the account name as "BRIAN JOHNSON" and the account number is reflected as "156403", which your Affiant knows is the State Identification Number ("SID")[4] assigned to JOHNSON.

22.     All but one of the more than one thousand (1000) calls initiated by JOHNSON were placed to (443) 983-2649, which, according to T-Mobile records is subscribed to SAMPSON. The initial activation date was June 3, 2008, and the deactivation date was in or around December 2012. The subscriber address is listed as "1517 Pesstman [sic] Street, Baltimore, MD 21217", which, after confirming with T-Mobile Law Enforcement Relations Group representatives and conducting additional investigative steps, your Affiant believes is a misspelling of Presstman Street.

23.     Based upon your Affiant's training, experience, and knowledge of the investigation, JOHNSON and SAMPSON have engaged in numerous telephonic discussions about unemployment insurance compensation; SAMPSON filing continuing claims for unemployment insurance compensation benefits on behalf of JOHNSON; the use of fraudulently obtained unemployment benefits to make retail purchases; and, knowingly engaging in the fraudulent unemployment insurance scheme with CD-1. For example, on January 22, 2012, at approximately 11:12 am, JOHNSON initiated a telephone call from the Baltimore City Jail Industries ("BCJI") facility to (443) 983-2649, the phone subscribed to and used by SAMPSON (hereinafter SAMPSON'S cell phone). During the conversation, SAMPSON and JOHNSON engage, in part, in the following discussion:

> SAMPSON: "...when I went on the thing this morning. It said something about, um, for those who file December 31st, that was the last

---

[4]     An SID number is assigned to every individual who is arrested or otherwise acquires a criminal history record in Maryland, and is also used as an identifier in the DPSCS management information systems.

of your thirteen weeks. But, I still put it in, so I...I don't know what's gonna happen."

JOHNSON: "They said what? It was the what?"

SAMPSON: "The last of the...that was the, um...uh...um...[unintelligible] saying thirteen weeks was up. Um, but they still let me go in and put it in so I don't know what's gonna happen. I don't know if you're gonna get anything or not."

(Later during the same telephonic conversation)

SAMPSON: "...even when you go on the...computer and look there ain't even nothing sayin' on there about it. It just said when you, when you call on the automated machine. As soon as the phone come on that what it say."

JOHNSON: "Thirteen weeks been exhausted."

SAMPSON: "Yeah. Said December the 31st was the last...um...file by...[unintelligible/overlapping voices]"

JOHNSON: "That might just be for that semester or something. I don't know."

SAMPSON: "I don't know. I'm hoping 'cause, I said, now, when I looked at the last filing date, the last filing date, it was 12/27."

24.     DLLR records reflect that on the same date as this telephone call, an individual who identified themselves as JOHNSON filed two (2) separate claims for continuing unemployment compensation via "Telecert" for the week ending January 14, 2012 and for the week ending January 21, 2012, respectively. The telephone toll records for SAMPSON's cell phone revealed three (3) successive calls placed at 12:45am, 12:51am, and 12:57am, to (410) 949-0022, which is the DLLR "Telecert" telephone number for claimants that are from the Baltimore area.

25.     Immediately following the foregoing call on January 22, 2012, at approximately 11:28 am, JOHNSON initiated another telephone call from the BCJI facility to SAMPSON's cell phone. During the conversation, JOHNSON states to SAMPSON, in part:

JOHNSON: "Like [God] don't want that money in my possession. You know?"

SAMPSON: "Umm-hmm."

JOHNSON: "It wouldn't be anyway though. You got the card..."

26.     On March 18, 2012, at approximately 12:13pm, JOHNSON initiated a telephone call from the BCJI facility to SAMPSON's cell phone. During the conversation, SAMPSON and JOHNSON engage, in part, in the following discussion:

> SAMPSON: "Oh, you know they done took one week…for the unemployment."
> JOHNSON: "From you?"
> SAMPSON: "From you."
> JOHNSON: "They took what?"
> SAMPSON: "One week. So you know you starting over."
> JOHNSON: "What you mean they took one week?"
> SAMPSON: "They only asked for one week. Remember I told you, I…I don't know how they do…remember I told you, I said when I get my first check it's probably gonna be for one week. Remember I told you I had to do it for one week."
> JOHNSON: "But how they gonna get me for one week?"
> SAMPSON: "Because you starting over; you're starting a whole new claim over."
> JOHNSON: "Boo, there's no way in the world I can start a new claim over."
> SAMPSON: "Well that's what you're doin', you is starting a whole brand new claim over [unintelligible/overlapping voices]…"
> JOHNSON: "Ok, so how one week get missing then?"
>  SAMPSON: "…well, they only [unintelligible]. I don't know, I don't know! They said, um, you have filed from…3/11 to 3/17. But mines was a two week that I had to do."[5]
> JOHNSON: "So you put yours in and, and mine in and, and mine was one week and yours was for two weeks?"
> SAMPSON: "Umm-hmm."

Later during the same telephonic conversation, SAMPSON and JOHNSON discuss the fact that JOHNSON has more money in his unemployment insurance account than he expected. SAMPSON explains that even though the money in JOHNSON's original account had been "exhausted," JOHNSON had "thirteen weeks" of money still left in his account because of "an extension that the President . . . done put out there."

27.    DLLR records reflect that on March 18, 2012, an individual identifying themselves as JOHNSON filed a claim for continuing unemployment insurance compensation via "Telecert" for the week ending March 17, 2012. Your Affiant reviewed telephone toll records provided by T-Mobile for SAMPSON's cell phone, which revealed two (2) successive calls placed at 6:41 am and 6:46 am, to (410) 949-0022, the DLLR "Telecert" telephone number for claimants.

---

[5]    DLLR records reviewed by your Affiant indicate that SAMPSON filed an initial claim for unemployment insurance compensation benefits online in her own name on or about January 3, 2012. The address of record on the SAMPSON unemployment insurance claim is Presstman Street and the telephone number provided to DLLR for the SAMPSON unemployment insurance claim is (443) 983-2649.

28.     On April 21, 2012, at approximately 10:03 am, JOHNSON initiated a telephone call to SAMPSON's cell phone from the BCJI facility.  During the conversation, JOHNSON and SAMPSON discussed costs associated with obtaining furniture from an establishment called the Rent-A-Center.

29.     Your Affiant reviewed records provided by Citi relating to the financial transaction history of JOHNSON's Citi debit card.  The transaction history revealed multiple monthly charges from "RENT-A-CENTER #1596." The charges first appear in the transaction history in or around January 2012 and continue through in or around May 2012. On September 18, 2012, your Affiant and another OLRFI Special Agent met with the store manager at Rent-A-Center ("RAC") Store No. 1596, located at 1251 W. Pratt Street, Suite I, Baltimore, Maryland 21223. The store manager confirmed that 1596 is the designated store number for the RAC location at 1251 W. Pratt Street. The store manager reviewed internal RAC records and located the use of the JOHNSON Citi debit card through an audit of electronic transactions. He further advised that someone used the JOHNSON Citi debit card to make payments via the Internet on two (2) customer accounts, including one in the name of SAMPSON with a customer account address of Presstman Street. The cell phone number reflected on the RAC account belongs to SAMPSON.  Based upon the foregoing, this is one example of when SAMPSON and JOHNSON used unemployment benefits fraudulently obtained under JOHNSON's name to make a retail purchase.

30.     On April 21, 2012, at approximately 10:18am, JOHNSON initiated a telephone call to SAMPSON's cell phone from the BCJI facility.  During the call, SAMPSON reads a letter addressed to JOHNSON notifying him that the federal extended benefits would cease by the end of April 2012, and the following conversation ensued:

> JOHNSON:   "Yeah. I guess it's exhausted then, Boo. But [unintelligible] …after that one check, you still could file the next week and see if they send you the other one."
> SAMPSON:   "No, but it sayin', see [unintelligible] not your week to file, you have to file the, the week of the 28th. And, then, but they only gonna give you money for the 21st, I mean for one week. Because you already…we already filed last week, last [unintelligible], you can't file this week."
> JOHNSON:   "So you filed [unintelligible]..."
> SAMPSON:   "[unintelligible]…Yeah."
> JOHNSON:   "Alright, well…it's, it's done. It was free money for us anyway, so . . . [unintelligible]…you know what I mean?"

11

SAMPSON:   "[unintelligible] Yeah."

31.     On July 28, 2012, at approximately 10:11am and 10:28 am, JOHNSON initiated two telephone calls to SAMPSON's cell phone from the BCJI facility.  During the following calls, in pertinent part, SAMPSON and JOHNSON converse about the fact that CD-1 is facing prosecution for his/her role in the unemployment insurance fraud scheme and what that might mean for JOHNSON:

> JOHNSON:   "I don't know. I know [CD-1] going to jail for that shit. They done traced all that shit down now. They, they...[laughs/unintelligible]."
> SAMPSON:   "I wonder how they catch his ass."
> JOHNSON:   "I hope they don't figure out [how][CD-1] fixed that unemployment shit for me."
> SAMPSON:   "They didn't. I wonder how they catch him."
> JOHNSON:   "Probably had the...it's called the paper trail."
> SAMPSON:   "Somebody had to snitch though . . ."
> (first phone call interrupted, second phone call begins)
> JOHNSON:   "What if...what if...what if...what if they find out that [CD-1],um...generated that unemployment for me?"
> SAMPSON:   "[unintelligible]...they think [CD-1] got it. Remember how long [CD-1] was getting unemployment?"
> JOHNSON:   "That was in the beginning."
> SAMPSON:   "Right."
> JOHNSON:   "They find out all them cards and stuff been transferring to our house [Presstman Street]."
> SAMPSON:   "They probably won't even look that far, Brian. You know what I'm sayin'? Because, remember when, um, your card was changed to our address [Presstman Street]...For the most part you was locked up..."
> JOHNSON:   ". . . Yeah. That's what I'd tell 'em too. I'd tell 'em, man, shit...I've been locked up, man; I don't know nothing about that stuff. [Laughs] That's exactly what I'd tell 'em too...Boo? . . . "

33. Your Affiant's review of DLLR records revealed that a person identifying themselves as JOHNSON filed several claims for continuing unemployment insurance compensation via "Telecert" on or about the following dates: January 8, 2012; January 22, 2012; March 4, 2012; March 18, 2012; April 1, 2012; and April 15, 2012. A comparison of SAMPSON's cell phone records identified calls from her cell phone to the DLLR "Telecert" telephone number on each of the aforementioned dates.  Furthermore, DLLR informed your Affiant that during the foregoing calls the caller who falsely identified themselves as JOHNSON would have had to falsely answer "Yes" to the first automated

question posed to the claimant by the "Telecert" automated system, which is: "Were you able and available to work full-time in your occupation without restrictions?" As already noted, JOHNSON was incarcerated during these periods of certification and therefore was not, in fact, "able and available to work full-time...without restrictions." Based upon the foregoing facts and information developed during the course of the investigation, your Affiant believes that SAMPSON is the one who interacted with the "Telecert" automated system posing as JOHNSON on each of the referenced dates, and she filed the continuing claims for unemployment compensation on behalf of JOHNSON in which SAMPSON falsely certified the information provided to DLLR.

34.     Under the Federally funded Extended Benefits ("EB") program, an unemployment insurance claimant is required by DLLR to record and submit job contacts for each week that the claimant files a continued claim. DLLR provides the necessary form, known as a "DLLR/DUI 298 EB 2/12", to the claimant. The form contains an advisement stating: "Making false statements may lead to a finding of unemployment insurance fraud." The forms also require that the claimant sign and affirm the information provided to DLLR on the form. On January 4, 2013, DLLR provided your Affiant with Forms "DLLR/DUI 298 2/12" filed on behalf of JOHNSON for the weeks ending: March 17, 2012; March 24, 2012; March 31, 2012; April 7, 2012; April 14, 2012, and April 21, 2012. The aforementioned Forms "DLLR/DUI 298 2/12" falsely certify that JOHNSON either filed numerous applications for employment "in person", or inquired "in person", at various employers located in the Baltimore metropolitan area, when, in fact, JOHNSON was incarcerated during the entire period of time covered in the forms submitted to DLLR. Based upon information developed during the course of the investigation, your Affiant believes that SAMPSON completed and submitted, or caused the completion and submission, of the fraudulent Forms "DLLR/DUI 298 2/12" to DLLR on behalf of JOHNSON.

35.     Furthermore, according to Citi records, seven (7) telephone calls were placed to Citi between April 2012 and May 2012 concerning the JOHNSON Citi debit card. All seven (7) calls originated from SAMPSON's cell phone.

36.     Records from the Division of Parole and Probation reflect that on September 18, 2012, JOHNSON reported in person with "his wife" to meet with JOHNSON's assigned DPP agent, and the case notes further reflect that JOHNSON "will

reside @ [Presstman Street] w/ a phone # of (443) 983-2649 [SAMPSON's cell phone number] which is wife's cell because there is no home phone."

37.     On December 20, 2012, your Affiant obtained online real property ownership information from the Maryland State Department of Assessments and Taxation ("SDAT") reflecting that SAMPSON is the current co-owner of Presstman Street, which is reflected as her principal residence.

38.     On or about January 7, 2013, your Affiant observed JOHNSON exiting and re-entering Presstman Street.

39.     As of January 18, 2013, Presstman Street is still listed as the address of record for SAMPSON.

## III.     CONCLUSION

40.     Your Affiant submits that the foregoing facts establish that JOHNSON and SAMPSON have been engaged in an unemployment insurance benefits scam whereby they filed fraudulent compensation claims and then made illegal withdrawals of and/or used state and federal government funds from the Citi Prepaid Services debit cards at ATMs and at retail and online stores, in violation of 18 U.S.C. § 1349.  Based upon their involvement in the conspiracy to commit wire fraud, your Affiant respectfully requests that warrants be issued for their arrest.


I declare under penalty of perjury that he foregoing is true and correct to the best of my knowledge.

TROY SPRINGER
Special Agent
U.S. Department of Labor – OIG/OLRFI


Subscribed and sworn to before me in Baltimore, Maryland, on this ___8TH___ day of February, 2013.

Beth P. Gesner
United States Magistrate Judge
District of Maryland